UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Christopher Nazario | : |
| Plaintiff, | : No. 3:21-cv-216-VLB |
| v. | : |
| | : June 30, 2022 |
| Nicole Thibeault, | : |
| Defendant. | : |

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 22]

On February 22, 2021, Plaintiff Christopher Nazario, previously incarcerated at Osborn Correctional Institution ("Osborn"), filed this action pursuant to 42 U.S.C. § 1983 against Defendant Nicole Thibeault, Deputy Warden at Osborn during the relevant events, for damages in her individual capacity. [Dkt. 1 (Compl.) ¶¶ 1–2, 4–5]. Plaintiff alleges that Defendant (1) knowingly exposed him to COVID-19 when she transferred him to a unit that housed COVID-19 positive and symptomatic inmates and (2) forced him to continue working as a laundry worker without personal protective equipment ("PPE"), further increasing his risk of contracting COVID-19. [*Id.* ¶¶ 1, 55]. Plaintiff asserts that Defendant's conduct constitutes deliberate indifference to Plaintiff's medical needs in violation of his Eighth Amendment rights under the U.S. Constitution. [*Id.* ¶¶ 53–55, 57].

Before the Court is Defendant's motion for summary judgment. *See generally* [Dkt. 22 (Def.'s Mot.)]. Defendant asserts that she is entitled to summary judgment because Plaintiff cannot establish the requisite elements of his claim,

1

including that Defendant was aware of any risk of harm to Plaintiff by changing his housing assignment, that Plaintiff was deprived of PPE, and that Defendant was personally involved in any constitutional violations. [*Id.* at 1, 4–5]. In addition, Defendant argues that she is entitled to qualified immunity. [*Id.* at 1]. Plaintiff objects to Defendant's motion on the basis that there are genuine disputes of material fact as to whether Defendant was aware of COVID-19 positive inmates in E-Block, whether Department of Correction ("DOC") policies were followed at Osborn, and whether Defendant's conduct was objectively reasonable. [Dkt. 27 (Pl.'s Mem.) at 2, 4, 6–7].

For the following reasons, the Court DENIES Defendant's motion for summary judgment.

I.  BACKGROUND

The following facts come from the parties' Local Rule 56(a) Statements as supported by evidence in the record, which the Court views in the light most favorable to Plaintiff.

Plaintiff was incarcerated at Osborn in March and April 2020 and worked as an inmate laundry worker at the facility in March of that year. [Dkt. 27-2 (Pl.'s 56(a)(2) Stmt.) ¶¶ 20–21]. Due to the COVID-19 pandemic, Osborn went on an emergency lockdown in mid-March 2020 to prevent the spread of the virus within the facility. [*Id.* ¶ 2].

From the beginning of the pandemic, Osborn implemented preventive measures against the spread of COVID-19 in accordance with the recommendations of DOC's Central Office, Osborn's health services staff, and the

Centers for Disease Control ("CDC"). [*Id.* ¶ 3]. Throughout the pandemic, Osborn staff consistently communicated with and continued to rely on the recommendations of DOC's Central Office and DOC health services staff regarding COVID-19 preventive measures. [*Id.* ¶¶ 31–32].

## A. Osborn's Quarantine Protocols

Plaintiff first challenges Defendant's implementation of protocols for quarantining inmates who tested positive for COVID-19 or had symptoms of the virus. These protocols were promulgated by DOC medical professionals and based on CDC guidelines. [*Id.* ¶¶ 12, 19]. Before May 13, 2020, an inmate with symptoms of COVID-19 would be immediately transferred to the medical unit, tested for COVID-19, and isolated in the F-Block housing unit pending test results. [*Id.* ¶ 13]. Symptomatic inmates and their cellmates would remain in F-Block, on opposite sides of the tier, for fourteen days. [*Id.* ¶ 14]. An inmate with a positive COVID-19 test result would be isolated in the Hospital 2 unit, pending transfer to Northern, the facility that DOC designated for the medical isolation of such inmates. [*Id.*]

Inmate workers were segregated from one another to ensure that there would be enough workers to continue essential facility services if a worker housing unit went into quarantine. [*Id.* ¶ 22]. In accordance with this plan, on April 3, 2020, Unit Manager Captain Perez and Defendant came to the industries mess hall at Osborn to deliver the news to the laundry workers, including Plaintiff, that they would be transferred to E-Block indefinitely. [Dkt. 27-2 (Add. Mat. Facts) ¶¶ 2–3; Dkt. 27-5 (Pl.'s Ex. 3) ¶¶ 7–8]. At the time, Plaintiff and the other laundry workers

3

were living in H-Block, where they had cells with windows and solid metal doors. [Dkt. 27-2 (Add. Mat. Facts) ¶¶ 4–6; Dkt. 27-5 ¶ 8; Dkt. 27-7 (Pl.'s Ex. 5) ¶ 9].[1] The cells in E-Block, on the other hand, had no windows and had bar doors that were open to the hallway. [Dkt. 27-2 (Add. Mat. Facts) ¶¶ 7–8; Dkt. 27-5 ¶ 12; Dkt. 27-7 ¶ 10].[2]

According to Plaintiff, the laundry workers voiced concern to Defendant that these features made E-Block a less safe housing option during a COVID-19 outbreak at the facility. [Dkt 1 ¶ 21]. In addition, the laundry workers, including Plaintiff, "told [Defendant] that there were COVID-19 positive and symptomatic inmates in E-Block."[3] [Dkt. 27-2 (Add. Mat. Facts) ¶ 10; Dkt. 27-5 ¶ 10; Dkt. 27-6 (Pl.'s Ex. 4) ¶ 14; Dkt. 27-7 ¶ 12]. According to one inmate's declaration, the laundry workers knew about the COVID-19 status of inmates in E-Block "because the kitchen workers were there." [Dkt. 27-7 ¶ 12].

Defendant warned the laundry workers that if they did not move to E-Block, they would lose their jobs, receive a negative work evaluation, get a ticket for

---

[1] Plaintiff incorrectly cites paragraph 16 of Exhibit 5 to support the statement that laundry workers had windows in their cells in H-Block. Paragraph 9 of Exhibit 5 properly supports this statement.

[2] Although Plaintiff incorrectly cites paragraph 17 of Exhibit 5 to establish that E-Block cells did not have windows, paragraph 10 of Exhibit 5 states, "[Defendant] knew that E-Block had no windows and bar doors that were open to the hallway."

[3] Plaintiff uses this evidence to prove that the statement was made to Defendant rather to prove the truth of the statement's content. Thus, the personal knowledge that is relevant for the purposes of Rule 602 of the Federal Rules of Evidence and Rule 56(c)(4) of the Federal Rules of Civil Procedure is the inmates' personal knowledge that the statement was made rather than, as Defendant argues, the inmates' personal knowledge that people in E-Block were symptomatic or had COVID-19. *See* [Dkt. 22 (Def.'s Reply) at 9-10]. Because the inmates observed the making of the statement, their declarations would be admissible to prove that the statement was made to Defendant.

refusing housing, and lose their single cells. [Dkt. 27-2 (Add. Mat. Facts) ¶ 13; Dkt. 27-5 ¶ 11; Dkt. 27-6 ¶ 15; Dkt. 27-7 ¶ 14]. Feeling as though they had "no choice," the laundry workers complied with the transfer and arrived at E-Block at the beginning of April. [Dkt. 27-2 ¶ 23; Dkt. 27-2 (Add. Mat. Facts) ¶ 14; Dkt. 27-4 (Pl.'s Ex. 3) ¶ 11; Dkt. 27-6 ¶ 15; Dkt. 27-7 ¶ 14].

Despite Osborn's quarantine protocols, inmates showing symptoms associated with the COVID-19 virus[4] were living in E-Block and using the unit's common areas at the time Plaintiff was transferred there.[5] For instance, as soon as they arrived at the top tier of E-Block, Plaintiff and five other laundry workers report that they heard and saw other inmates coughing and sneezing on the bottom tier of the unit and in the cells "all around" the laundry workers. [Dkt. 27-2 ¶ 24; Dkt. 1 ¶ 28; Dkt. 27-4 ¶ 18; Dkt. 27-5 ¶¶ 14–16; Dkt. 27-6 ¶¶ 18–20; Dkt. 27-7 ¶¶ 16–17; Dkt. 27-8 (Pl.'s Ex. 6) ¶ 22]. Another inmate states that he heard people vomiting in the unit. [Dkt. 27-8 ¶ 22]. In addition, one inmate claims that "people who were clearly sick" were using the unit's communal phones and showers, which is

---

[4] As of March 23, 2020, the CDC's guidance on managing COVID-19 in prisons recognized only "fever, cough, and shortness of breath" as symptoms of COVID-19. [Dkt. 22-4 (Def.'s Ex. A to Kennedy Decl. Def.'s Ex. B) at 4]. The CDC nonetheless acknowledged that, because of the novelty of COVID-19, "the full range of signs and symptoms . . . [were] not yet fully understood" at the time. (*Id.*) Currently, the CDC's website lists, among other things, coughing and vomiting as possible symptoms of COVID-19. Symptoms, Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (Feb. 21, 2021).

[5] Defendant asserts that inmates who tested positive for COVID-19 or had COVID-19 symptoms were not housed in E-Block in April or May 2020 but were instead isolated and quarantined according to DOC medical professionals' recommendations. [Dkt. 22-2 ¶¶ 24–25]. However, the Court must believe Plaintiff's evidence at the summary judgment stage.

5

corroborated by another inmate's declaration stating that he witnessed people coughing in the unit's shower and phone areas.  [Dkt. 27-7 ¶ 18; Dkt. 27-6 ¶ 18]. Furthermore, Plaintiff cites his verified complaint and another inmate's declaration claiming that another ten to twenty inmates exhibiting unspecified symptoms were transferred to E-Block in the first week of April.[6]  [Dkt. 27-2 (Add. Mat. Facts) ¶ 20; Dkt. 1 ¶¶ 30–31; Dkt. 27-6 ¶ 24].

On top of asserting that there were symptomatic inmates in E-Block, three laundry workers report in their declarations that the unit was "filthy" when they arrived, despite Defendant telling them prior to the transfer that the unit had just been cleaned.  [Dkt. 27-2 (Add. Mat. Facts) ¶¶ 9, 16; Dkt. 27-5 ¶¶ 9, 17; Dkt. 27-6 ¶¶ 13, 16, 22; Dkt. 27-7 ¶¶ 10, 19.)  The laundry workers state that there was dust, dirt, and trash in the cells, the toilets smelled of urine and feces and the sinks smelled of sewage, and, in one of their cells, there was vomit on the walls near the toilet and the bars were caked with dried food and liquid. [Dkt. 27-5 ¶ 17; Dkt. 27-6 ¶ 22; Dkt. 27-7 ¶ 19].

  B.  PPE Protocols

Plaintiff asserts that laundry workers were not supplied with requested PPE to perform their jobs. In March 2020, the laundry workers personally requested PPE from Defendant and other Osborn officials who were visiting the laundry services area, the officials responded, "We don't have that here."  [Dkt.27-2 (Add. Mat. Facts) ¶ 1; Dkt. 27-5 ¶ 6; Dkt. 27-6 ¶ 10].  Inmates and staff were issued masks and required

---

[6] Plaintiff asserts that these inmates came from Carl Robinson Correctional Institution, but the cited affidavits do not establish the requisite personal knowledge of where the inmates came from.

to wear them in the facility as of April 3, 2020.[7] [Dkt. 22-2 ¶ 7; Dkt. 22-3 (Thibeault Decl. Def.'s Ex. A) ¶ 6].[8] However, two inmates claim that they were not supplied with cloth masks until either the end of April 2020 or sometime in May 2020.[9] [Dkt. 27-2 ¶ 6; Dkt. 27-4 ¶ 5; Dkt. 27-5 ¶ 5].

In addition to being deprived of surgical masks until May 2020,[10] the laundry workers' requests for Tyvek suits, shields, N95 masks, boots, and other PPE were not satisfied until after they had contracted COVID-19. [Dkt. 27-2 ¶ 11; Dkt. 27-6 ¶ 9;[11] Dkt. 27-2 (Add. Mat. Facts) ¶ 22; Dkt. 27-5 ¶ 23].

### C. Plaintiff's COVID-19 Diagnosis and Treatment

While living in E-block, Plaintiff contracted COVID-19. [Dkt. 27-2 (Add. Mat. Facts) ¶ 23; Dkt. 1 ¶¶ 32–34]. As a result, he was transferred to F-Block on April 29,

---

[7] Plaintiff denies this statement but merely cites inmates' declarations asserting that Osborn staff sometimes did not wear their masks in the facility. ([Dkt. 27-2 ¶ 7; Dkt. 27-4 ¶ 22; Dkt.27-5 ¶ 22; Dkt. 27-6 ¶ 25; Dkt. 27-7 ¶ 21; Dkt. 27-8 ¶ 27]. He has not provided any evidence that staff were not supplied with masks or that staff and inmates were not required to wear masks.

[8] Defendant incorrectly cites paragraph 7 of Exhibit A, the declaration of Defendant Nicole Thibeault, to support this statement. However, paragraph 6 of that exhibit states, "Osborn staff were also issued masks as of April 3, 2020, and inmates and staff were required to wear masks at all times while inside the facility."

[9] Defendant asserts that, as of April 6, 2020, Osborn inmates were given at least two cloth masks. [Dkt. 22-2 ¶ 6]. However, for the purposes of summary judgment, the Court accepts Plaintiff's evidence as true.

[10] Defendant disputes this, alleging that, in addition to the two cloth masks, laundry workers were each provided a surgical mask on a weekly basis, starting April 17, 2020. [Dkt. 22-2 ¶ 11]. Nonetheless, the Court shall believe Plaintiff's evidence for the purposes of this motion.

[11] Plaintiff cites paragraph 5 of Exhibit 2, paragraph 5 of Exhibit 3, and paragraph 6 of Exhibit 5 to support this assertion, but the cited evidence discusses cloth masks and masks generally rather than surgical masks. However, paragraph 9 of Exhibit 4 states, "We were never provided with surgical masks until May 2020, after the laundry workers who contracted COVID-19 returned from Northern Correctional Institution."

7

2020. [Dkt. 27-2 ¶ 29]. The next day, he was transferred to Northern, where his condition deteriorated, and he was put on a breathing machine. ([Dkt. 27-2 (Add. Mat. Facts) ¶¶ 23–24; Dkt. 1 ¶¶ 34–35].[12] On his first day at Northern, Plaintiff was transferred to UCONN Medical Center, where his condition continued to deteriorate. [Dkt. 27-2 (Add. Mat. Facts) ¶ 24; Dkt. 1 ¶¶ 36–37].[13] He remained at UCONN Medical Center for a week as he recovered from COVID-19 and was then transferred back to Northern, where he experienced "after-effects of COVID-19," including damage to his heart and circulatory system. [Dkt. 27-2 (Add. Mat. Facts) ¶ 24; Dkt. 1 ¶¶ 38–41.)[14] On May 13, 2020, Plaintiff had a heart attack at Northern, leading paramedics to transport him to the ICU at Hartford Hospital, where he underwent multiple stent procedures. [Dkt. 27-2 (Add. Mat. Facts) ¶ 24; Dkt. 1 ¶¶ 42–44]. At the hospital, Plaintiff's heart stopped twice, and hospital staff revived him both times. [*Id.*]. Due to his heart attack, Plaintiff had a pacemaker permanently implanted in his chest. [*Id.*].

Plaintiff later filed this action pursuant to 42 U.S.C. § 1983 against Defendant for damages in her individual capacity, alleging that she knowingly exposed him to COVID-19 and was thereby deliberately indifferent to his health and safety in violation of his Eighth Amendment rights. [Dkt. 1 ¶¶ 2, 5, 53–55, 57].

---

[12] Although Plaintiff fails to cite any evidence that, at Northern, his condition deteriorated and he was put on a breathing machine, the Court acknowledges that paragraph 35 of Exhibit 1 directly supports this assertion.

[13] Plaintiff fails to cite any evidence to support this, the Court acknowledges that paragraph 35 of Exhibit 1 supports this assertion.

[14] Plaintiff fails to cite any evidence to support this, the Court acknowledges that paragraphs 38 and 39 of Exhibit 1 supports this assertion.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the burden of showing that there is no such factual dispute. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).  A factual dispute is "genuine" if there is evidence on which "a reasonable jury could return a verdict for the nonmoving party," and a disputed fact is "material" only if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  If the moving party shows that there is no genuine dispute as to any material fact, to defeat the motion the opposing party must provide "specific evidence" that such a dispute exists. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  In making this showing, the opposing party "may not rely on conclusory allegations or unsubstantiated speculation." *Id.*

In deciding a motion for summary judgment, the Court must view the evidence "in the light most favorable" to the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  This requires the Court to believe the evidence of the nonmovant and draw "all justifiable inferences" in his favor, *Liberty Lobby*, 477 U.S. at 255, and to "disregard all evidence favorable to the moving party that the jury is not required to believe," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, 477 U.S. at 255.  Accordingly, summary judgment must be denied if, regarding the issue on which summary judgment is sought, the record

contains any evidence from which a reasonable inference could be drawn in the opposing party's favor. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *see also Liberty Lobby*, 477 U.S. at 250 (stating that summary judgment is appropriate only if "there can be but one reasonable conclusion as to the verdict"). While the Court is required to consider only the cited evidence when making its decision, it has the authority to also consider other materials in the record that are not cited by the parties. Fed. R. Civ. P. 56(c)(3).

### III. DISCUSSION

In a section 1983 claim, the plaintiff "must directly plead and prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). The Eighth Amendment prohibits deliberate indifference to an inmate's serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish an Eighth Amendment claim against a prison official on the basis of inadequate medical care, a prisoner must prove that the official committed "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 105–06. The prisoner must satisfy both an objective prong and a subjective prong.

"First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). A prisoner's medical need is sufficiently serious if it is "a condition of urgency, one that may produce death, degeneration, or

10

extreme pain." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

Second, the prison official "must act with a sufficiently culpable state of mind." *Hathaway*, 99 F.3d at 553. This requires the official to "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway*, 37 F.3d at 66 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). However, even if the official had the requisite knowledge and the harm was not ultimately prevented, the official may avoid liability if she "responded reasonably to the risk." *Farmer*, 511 U.S. at 844.

The Court will first address the objective prong as it relates to Plaintiff's claims and then separately address whether Plaintiffs' challenges to the implementation of quarantine protocols and the adequacy of PPE Osborn provided satisfy the subjective prong.

### A. Objective Prong

"[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease." *Jolly v.* Coughlin, 76 F.3d 468, 477 (2d Cir. 1996). Courts have found that inmates may face a substantial risk of serious harm absent adequate measures to counter the spread of COVID as it is "undisputed—and, indeed, by now common knowledge—that COVID-19 is a highly dangerous disease that poses a significant risk of severe illness and death." *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 440 (D. Conn. 2020); *Jones v. Westchester*

11

*Cnty.*, No. 20-CV-08542 (PMH), 2022 WL 1406591, at *3 (S.D.N.Y. May 4, 2022) (collecting cases). Accordingly, courts within this circuit have found that COVID-19 can pose a substantial risk of serious harm to prisoners if the prison fails to take adequate measures against the spread of the virus. *Chunn v. Edge*, 465 F. Supp. 3d 168, 200 (E.D.N.Y 2020) (collecting cases). Thus, under the circumstances of this case, the relevant inquiry is whether Plaintiff's evidence establishes a substantial risk of serious harm, considering the preventive measures that Osborn has taken. *Gibson v. Rodriguez*, No. 3:20-CV-953, 2021 WL 4690701, at *5 (D. Conn. Oct. 7, 2021).

Defendant argues that, considering the precautions that DOC took against COVID-19 within the state's prisons, Plaintiff cannot establish that he was exposed to an objectively substantial risk of serious harm. [Dkt. 22-1 (Def.'s Mem.) at 4–5]. Defendant compares this case to *Gibson v. Rodriguez*, another case from this District filed by an inmate challenging the same preventive measures implemented at Osborn that the Plaintiff challenges. *Gibson*, at *5. In *Gibson*, the Court found that the plaintiff failed to satisfy the objective element of the deliberate indifference standard because he "offer[ed] no admissible evidence that these procedures were not put in place at Osborn." *Id.*, at *6.

The Court disagrees with this comparison. In this case, Plaintiff has raised a genuine dispute of material fact as to whether Osborn followed DOC's COVID-19 policies. Plaintiff has provided evidence that Osborn housed symptomatic inmates with the general population, allowed sick inmates to use the same phones and showers as the other inmates, did not frequently clean the facility, and did not

provide inmates with the PPE they demanded to safely perform their jobs. A reasonable jury could find that this evidence establishes that Osborn failed to implement at least some of its alleged COVID-19 policies.

### B. Subjective Prong

Plaintiff has alleged sufficient facts that his exposure to COVID-19 resulted from Defendant's deliberate indifference to survive summary judgment. Plaintiff's deliberate indifference claim turns on whether Defendant was aware that Plaintiff risked catching COVID-19 and whether she acted in a way that disregarded that risk. See *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Plaintiff specifically contends that, despite Osborn's quarantine protocols, Defendant was aware that Plaintiff and the other laundry workers were moved into a housing unit with COVID-19 positive and/or symptomatic inmates. He also asserts that Defendant did not provide the laundry workers with proper PPE to safely perform their duties.

#### 1. *Plaintiff's Challenge to Implementation of Quarantine Protocols*

Plaintiff has raised a genuine dispute of material fact as to whether Defendant was aware that there were COVID-19 positive and symptomatic inmates in E-block. Defendant claims that she transferred Plaintiff in accordance with DOC's policies and procedures and she was "not aware of any inmates in E-Block who had COVID-19 or exhibited COVID-19 symptoms when plaintiff was moved there." [Dkt. 22-1 at 7].

Plaintiff disputes this by filing affidavits from other laundry workers stating that they told Defendant there were positive and/or symptomatic inmates in E-block both before and after their transfer. The Court acknowledges that the Plaintiff's

13

evidence establishing Defendant's awareness of positive and/or symptomatic COVID-19 inmates in E-block is weak. In addition to the statements the laundry workers made to Defendant, Plaintiff cites to evidence that there were inmates exhibiting COVID-19 symptoms in E-block, that inmates were transferred out of E-block to the hospital or Northern, that Defendant, as a supervisor was required to tour E-block and would have seen symptomatic inmates, and that other supervisors toured E-block and saw symptomatic inmates. [Dkt. 27-5 ¶¶ 14, 18-21]. However, none of this evidence supports Defendant's actual knowledge of the status of the inmates in E-block therefore the Court cannot consider it.

Based on the statements in the laundry workers' affidavits, a reasonable jury could conclude that Defendant had notice of the risk associated with transferring Plaintiff to E-block and disregarded that risk when she effectuated the transfer.

2.  *Plaintiff's Challenge to Adequacy of PPE*

Plaintiff has also raised a genuine dispute of material fact as to whether Defendant acted with deliberate indifference in failing to provide Plaintiff and the other laundry workers with the requested PPE. Defendant states that she was "not involved in, or responsible for, promulgating policies regarding the issuance of PPE," and that she merely distributed PPE in accordance with DOC's policies. [Dkt. 22-1 at 9]. However, Plaintiff's evidence shows that these procedures may not have been followed. Defendant admits that she personally implemented DOC policies, thus, absent evidence to the contrary, the Court can infer that Defendant was at least partially responsible for implementing the policies related to supplying inmates with PPE.

In March 2020, the laundry workers asked Osborn officials, including Defendant, for additional PPE that were not supplied as part of DOC's policies, including Tyvek suits, shields, and N95 masks. The officials responded "we don't have that here." [Dkt. 27-2 (Add. Mat. Facts) ¶ 1].

Defendant had a duty to seek the assistance of a medical professional in assessing whether Plaintiff required additional PPE, or any at all, to perform his job safely. *See Garcia v. Univ. of Conn. Health Care Ctr.*, No. 3:16-CV-852, 2018 WL 5830840, at *15 (D. Conn. Nov. 7, 2018) (Defendants' argument that they acted reasonably in following prison procedure "misse[d] the point" because "corrections officers have a duty to seek a physician's assistance in circumstances that call for medical treatment, including the procurement and administration of medication." (citing *Estelle*, 429 U.S. at 104-05 (holding that indifference to serious medical needs violates the Eighth Amendment, "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by *prison guards in intentionally denying or delaying access to medical care* or intentionally interfering with the treatment once prescribed")). Once the laundry workers requested additional PPE, Defendant had a duty to look into whether that PPE was necessary to ensure the laundry workers' safety.

Drawing reasonable inferences in favor of the Plaintiff, a reasonably jury could conclude that, in failing to provide Plaintiff with proper PPE, Defendant placed Plaintiff at a heightened risk of contracting COVID-19.

### C. Qualified Immunity

Qualified immunity shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity provides government officials with "breathing room to make reasonable but mistaken judgments about open legal questions" and shields "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Accordingly, "[w]hen a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

An official's conduct violates a clearly established right if, "at the time of the challenged conduct, . . . every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). For a right to be clearly established, while "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. The Court must consider this inquiry "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

16

**Therefore, an official is entitled to qualified immunity if, considering the law that was clearly established at the time, the official's conduct was "objectively legally reasonable."** *Taravella*, 599 F.3d at 133 (quoting *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 66 (2d Cir. 1999)).  **The objective reasonableness of an official's conduct "is a mixed question of law and fact."** *Taravella*, 599 F.3d at 134 (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004).  **At the summary judgment stage, while a conclusion that an official's conduct "was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder."** *Taravella*, 599 F.3d at 135 (quoting *Kerman*, 374 F.3d at 109).

**Defendant argues that she is entitled to qualified immunity because Plaintiff has not established that she committed a constitutional violation of a clearly established right. [Dkt. 22-1 at 17-18]. Defendant asks the Court to consider "the unique and challenging situation" that Defendant faced "in managing a correctional facility during an unprecedented global pandemic and the outbreak of a novel and highly contagious virus." [***Id.***, at 17]. Defendant emphasizes that, despite this challenge, she, along with DOC and other Osborn staff, "took extraordinary efforts" in response to the risk of COVID-19 at Osborn and did so "to the best of their ability given the circumstances." [***Id.*** at 17–18]. Defendant asserts once again that she followed the recommendations of public health professionals and the CDC and adjusted those measures as necessary based on updated recommendations. (***Id.*** at 18.)  Defendant argues that she acted objectively**

17

reasonably in her belief that she was not violating Plaintiff's clearly established rights because "[n]o reasonable correctional official in [her] position would believe that he or she was violating any of [Plaintiff's] clearly established rights" by implementing measures according to "the recommendations of public health officials and the CDC for managing a novel and contagious virus in a correctional setting."

The Court disagrees with the Defendant. The Second Circuit has "held that correctional officials have an affirmative obligation to protect inmates from infectious disease." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996). *See also Helling v. McKinney*, 509 U.S. 25, 33 (1993) (rejecting in dicta that prison officials may "be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms); *Hutto v. Finney*, 437 U.S. 678, 682-83 (1978) (affirming a finding of an Eighth Amendment violation where a facility housed prisoners, some of whom had infectious diseases, in crowded cells, and "removed and jumbled" their mattresses together each morning before returning them to the cells "at random" at night).  Even at the beginning of the pandemic in March 2020, a reasonable official would have realized that Covid-19 is a serious infectious disease from which prison officials had a duty to protect inmates. This is supported by the fact that officials began implementing policies in response to COVID-19 as early as March 13, 2020.

The Court agrees with the Plaintiff and finds that the qualified immunity analysis turns on disputed facts. Because there are genuine disputes of material

fact as to whether Defendant complied with the preventive measures in place at Osborn, the Court denies Defendant's motion for summary judgment on the issue of qualified immunity.

## CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment is DENIED.


    IT IS SO ORDERED.

                                                           _____
                                                           **Hon. Vanessa L. Bryant**
                                                           **United States District Judge**

**Dated this day in Hartford, Connecticut: June 30, 2022**